**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **Rod James CJD, LLC** ) | **CASE NO. 1:09 CV 986** |
| **dba Chrysler Dodge Jeep of Gallion,** ) | |
| **et al.** ) | |
| Plaintiffs, ) | **JUDGE PATRICIA A. GAUGHAN** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| **Chrysler Motors, LLC, et al.** ) | |
| ) | **Memorandum of Opinion and Order** |
| ) | |
| Defendants, ) | |
| vs. ) | |
| ) | |
| **Minty James** ) | |
| ) | |
| Third-Party Defendant. ) | |

**Introduction**

This matter is before the Court upon defendant and third-party plaintiff Chrysler Financial Services Americas LLC's Motion for Summary Judgment (Doc. 49). This case arises out of financing plaintiffs sought and obtained from moving defendant in order to purchase an automobile dealership. For the following reasons, the motion is GRANTED.

1

**Facts**

Plaintiffs, Rod James CJD, LLC dba Chrysler Dodge Jeep of Galion, Rodney James, and Laval Perry, filed this Complaint against defendants, Chrysler Motors, LLC[1] and Chrysler Financial Services Americas, LLC (hereafter, defendant or Chrysler Financial).  Chrysler Financial filed a Counterclaim against plaintiffs and Third-Party Complaint against third-party defendant Minty James, the wife of Rodney James.

In June 2007, plaintiff Rodney James (hereafter, James) learned of a Chrysler automobile dealership for sale in Galion, Ohio.  James contacted the seller who suggested that James contact Chrysler Financial for help with the financing of the dealership.  The seller indicated that because James is a minority, strong consideration would be given to him. James immediately contacted Chrysler Financial and spoke with a representative.  Over the next several months, James had telephone conversations and meetings with Chrysler Financial employees.  He completed a dealer financial application. (Rodney James depo. 24-31, 44, 47) Additionally, in July 2007, James completed a formal application for financing with UPS Financial.  He also made inquiries with KeyBank and National City Bank. (*Id.* 57, 65-66)

According to James, around late September, Chrysler Financial told James that he was "tentatively approved" but that he "needed to bring more cash to the table and a strong co-signer on the cap loan."  As a result, James contacted plaintiff Perry and asked him to provide the additional cash and to co-sign on the note.  (*Id.* 68-71) Although Perry did not co-sign, he

---

[1] Defendant Chrysler Motors, LLC filed for bankruptcy relief in April 2009. Consequently, the case was stayed as to that defendant. This Court subsequently determined that the stay did not apply to Chrysler Financial.

2

agreed to a 25% ownership interest in exchange for cash and a line of credit provided.  (Exs. 31, 37)

According to John McNelis, defendant's Senior Manager-Credit Administration who had oversight responsibility regarding the matters herein, in mid-October 2007, Chrysler Financial rejected the loan application submitted by James on behalf of Rod James CJD. Among other things, Chrysler Financial determined that plaintiffs lacked sufficient working capital.  James, however, urged Chrysler Financial to reconsider its position, arguing that since he expected to sell fewer cars than his predecessor on the same site, a lower working capital requirement was appropriate.  As a result, Chrysler Financial reviewed its earlier rejection, and based on the business plan provided by James coupled with a Continuing Guaranty provided by Perry, accepted a lower working capital requirement.  (John McNelis aff.)

In November 2007, Chrysler Financial extended a floor plan line of credit to Rod James CJD which included a Capital Loan, for which James, on behalf of Rod James CJD, signed a Capital Note.  (*Id.*)   The loan documents consisted of the Master Loan and Security Agreement (MLSA), Capital Loan Addendum to Master Loan and Security Agreement, Capital Note, and Principal and Interest Addendum to Capital Note.  (Doc. 49 depo. Exs. 1-4) Third-party defendant Minty James was a co-obligor on the MLSA along with Rod James CJD.  (*Id.* Ex. 1) Perry guaranteed the Capital Note.  (Doc. 49 depo. Ex. 36)

Subsequently, on November 19, 2007, Rod James CJD executed three Sales and Service Agreements with Chrysler Motors, LLC, thereby obtaining the right to operate the Chrysler, Dodge and Jeep dealership in Galion.  (*Id.* Exs.32-34) James then opened the

dealership and began operation by the end of November. (James depo. 121-122) According to James, however, "the fourth quarter in 2007 was horrific in the car business" and "the market conditions were severe, they turned negative, extremely negative." As a result, James began to struggle almost immediately. (James depo. 125, 128)

McNelis had oversight responsibility for the approval of the floor plan line of credit and Capital Loan to plaintiffs and oversight responsibility for the regular review of the Rod James CJD dealership's financial condition to determine whether credit lines should be continued. McNelis avers that Rod James CJD failed to maintain the required level of financial indicators required by the MLSA. In particular, by June 2008, Rod James CJD had deficient levels of working capital and total net worth. Additionally, Rod James CJD's "used vehicle encumbrance ratio" was not in compliance with Chrysler Financial's guidelines, meaning that the aggregate floor plan amount for used vehicles had not remained below 75% of the value of the used vehicles. Failure to maintain the required level of these financial indicators constituted a default under the MLSA. (McNelis aff.) By letter of July 3, 2008, McNelis informed James of the default. (Doc. 49 depo. Ex. 20)

As of February 2009, Rod James CJD's working capital, total net worth, and other financial indicators had continued to decline. The deficient conditions constituted a default under the MLSA. (McNelis aff.) McNelis informed plaintiffs of the default by letter of February 25, 2009. (Doc. 49 depo. Ex. 28) At that time, Chrysler Financial offered to forebear from exercising its default remedies if Rod James CJD brought the dealership into compliance with the requirements under the MLSA. (*Id.*; McNelis aff.) Plaintiffs failed to bring the dealership into compliance. (McNelis aff.)

4

Then, in April 2009, Chrysler Financial discovered that Rod James CJD sold at least 9 vehicles "out of trust" (referred to as SOT). Chrysler Financial refers to a vehicle SOT when it is financed 100% through Chrysler Financial pursuant to a MLSA and a dealer sells the vehicle to an innocent third-party purchaser without remitting any of the payment to Chrysler Financial to cover the principal and interest due on the floor plan financing in connection with the vehicle. (McNelis aff.)

As a result of the SOT and Rod James CJD's failure to comply with the requirements of the proposed forebearance, Chrysler Financial demanded possession of its collateral and payment of the outstanding balance by letter of April 24, 2009. (McNelis aff.; Doc. 49 depo. Ex. 29) Plaintiffs failed to pay any of the outstanding balance on the MLSA and Capital Note, but James agreed to permit Chrysler Financial to repossess the vehicles that were collateral. James did not, however, agree to repossession of the parts inventory and equipment. Chrysler Financial then agreed, through stipulation with this Court, that Rod James CJD would first have the opportunity to sell the parts inventory and equipment. Plaintiffs failed to do so. (McNelis aff.) During the pendency of the agreement, however, a break-in occurred at the Rod James CDJ building and equipment was stolen. (James depo. 211-212)

On April 29, 2009, plaintiffs filed their Complaint, setting forth six claims. Count One alleges breach of contract. Count Two alleges fraud and misrepresentation. Count Three alleges violation of Automobile Dealer Day in Court Act. Count Four alleges violation of Ohio Revised Code § 4517.49, *et seq.* Count Five alleges violation of the Equal Credit Opportunity Act. Count Six seeks injunctive relief.

Chrysler Financial's Counterclaim and Third-Party Complaint asserts four claims.

5

Count One alleges breach of contract against Rod James CJD, Rodney James, and Minty James.  Count Two alleges breach of contract (guaranty) against Laval Perry. Count Three alleges replevin against Rod James CJD, Rodney James, and Minty James. Count Four alleges conversion against Rod James CJD, Rodney James, and Minty James.  Chrysler Financial now dismisses Counts Three and Four without prejudice given Rod James CJD's surrender of the remaining parts inventory and the theft of the bulk of the remaining equipment.  (Doc. 49 at 2)

This matter is now before the Court upon defendant and third-party plaintiff Chrysler Financial Services Americas LLC's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party. Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

Defendant moves for summary judgment on all counts of the Complaint and the remaining two counts of its Counterclaim. In response, plaintiffs argue only that issues of

fact remain as to their fraud claim (Count Two) and, on this basis, the Counterclaim. Plaintiffs fail to address any other arguments set forth in the Motion for Summary Judgment. As plaintiffs do not contest that summary judgment is warranted in defendant's favor on Counts One, Three, Four, Five, and Six, the Court hereby enters summary judgment for defendant on these counts for the reasons stated by defendant.

### Count Two- fraud

Count Two alleges that defendant "never mentioned to James that the deal as finalized was undercapitalized. Had James and Perry been aware that there was not sufficient working capital for the store to operate successfully, they would not have gone through with the transaction." (Compl. ¶ 47) It is alleged that defendant "concealed the truth about the undercapitalization with the intent of inducing plaintiffs to pursue financing" with defendant and that defendant fraudulently induced plaintiffs to become Chrysler franchisees in an underperforming market with promises of additional capital and start up costs. (*Id.* ¶¶ 48-49)

In order to prevail on their fraud claim, plaintiffs must establish:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Leal v. Holtvogt*, 123 Ohio App.3d 51 (2d App. Dist. 1998) (citations omitted).

Defendant argues that the fraud claim fails for at least the following four reasons.

First, defendant contends that there is no legally recognized duty which obligated it to disclose its opinion regarding the amount of capital needed to successfully operate the business. Defendant points to *Blon v. Bank One, Akron,* 35 Ohio St.3d 98 (1988), wherein the

8

Ohio Supreme Court stated, "[o]rdinarily in business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other."  An exception exists where there is a fiduciary or some other special relationship, but there is no evidence of such here where plaintiffs are capable businessmen with years of experience owning and operating automobile dealerships. Thus, only a debtor-creditor relationship existed between the parties and no duty to disclose obligated defendant to offer its views concerning the amount of capital needed.

Second, defendant asserts that the alleged omission is not actionable because only statements of fact are actionable, not mere opinion.  *Scotts Company LLC v. Liberty Mut. Ins. Co.*, 606 F.Supp.2d 722 (S.D.Ohio 2009) ("[T]o satisfy the elements of fraud, a representation must be as to a fact material in the transaction, not mere opinion.") Defendant asserts that it accurately told plaintiffs the amount of capital that defendant required in order to make the requested loan, and it made the loan according to the agreed upon terms.  While plaintiffs now complain that defendant failed to tell them that more capital might be required and that in the opinion of defendant, Rod James CJD was undercapitalized, James acknowledged at deposition that the amount of capital required to succeed in any particular business changes over time and depends on a company's business plan and ever changing market conditions. (James depo. 87-88).  Thus, the amount of capital that a business needs to be successful is a matter of opinion as to which reasonable minds might differ, and not a fact.

Third, defendant asserts that it did not make a material misrepresentation or omission. Defendant reasons that common sense compels the conclusion that it did not mislead the

9

plaintiffs with respect to its capital requirements given that it agreed to extend the credit on specified terms, and it fulfilled its contractual obligation to make the loan on those terms. Thus, defendant concluded that the working capital available to Rod James CJD at the time that it agreed to make the loans requested by plaintiffs was sufficient to justify the extension of the agreed upon credit. Whether the working capital available to Rod James CJD at that time was sufficient to ensure the company's survival over the long run was a different question, the answer to which depended on the company's business plan and managements' assessment of national and local market trends. Responsibility for the resolution of those issues and the determination of the amount of working capital that Rod James CJD required to survive and thrive rested, defendant asserts, with the owners and experienced businessmen who made up the company's management team, not with defendant.

Fourth, defendant contends that plaintiffs did not justifiably rely on any alleged non-disclosure. To the contrary, defendant asserts, plaintiffs knew that defendant thought that Rod James CJD might need additional working capital and that they did not rely on defendant's assessment of their business's working capital requirements.

Defendant points to James's initial deposition testimony that defendant never told him what its minimum working capital requirements were. (James depo. 56) After reviewing two letters that he wrote prior to opening Rod James CJD, James changed his testimony and acknowledged that Chrysler Financial did, in fact, provide information concerning its specific working capital requirements. First, in a letter that James wrote to Chrysler Motors in August 2007, he stated: "The working capital that Chrysler Financial would like me to start with is $500,000." (*Id.* 134; Ex. 14) Perry also testified that he saw this letter before he signed

10

his Continuing Guaranty. (Perry depo. 62) On November 5, 2007, just weeks prior to opening the dealership, James wrote to McNelis and stated: "The last item I am concerned about is the working capital guide that was presented to me by Jack Gannon, dealer placement manager[,] and what I am being told at this point. Jack ['s] figure has been around $350,000 and your number is $600,000." (Ex. 16) James admitted to drafting and sending that letter, but testified that the $600,000 figure was a typo, and that "the number was $500,000, not $600,000." (James depo. 151).

Defendant contends that given these letters and the deposition testimony, plaintiffs cannot deny that Chrysler Financial raised the possibility that Rod James CJD might require higher levels of working capital than plaintiffs initially planned and, thus, they cannot assert that they reasonably relied on any representation that the minimum level of working capital required as a condition of extending financing would necessarily be sufficient to ensure the success of Rod James CJD.

As acknowledged by plaintiffs, defendant contends that Chrysler Financial originally rejected their loan application on the grounds, among other things, that plaintiffs lacked sufficient working capital. (James depo. 86; McNellis aff. ¶ 4; Ex. 16) Defendant reached that conclusion by assuming that plaintiffs would run the Rod James CJD franchise along more or less the same lines as the predecessor business that occupied the same site. James had then urged defendant to reconsider its position arguing that since he expected to sell fewer cars, a lower working capital requirement was appropriate.  At James' request, defendant reviewed its earlier rejection of his financing application, and based on the business plan provided by James coupled with the guaranty provided by Perry, accepted a lower working capital

11

requirement. (McNelis aff.)

On this basis, defendant asserts, not only are plaintiffs equitably estopped from now asserting that defendant failed to disclose a higher "actual" working capital requirement, but they could not have reasonably relied on an alleged omission to provide the working capital requirements when plaintiffs themselves urged defendant to reduce its original minimum working capital threshold to a lower number.

Plaintiffs do not address these arguments but argue that defendant made a material misrepresentation. Specifically, plaintiffs contend that defendant told James that $800,000 was needed to purchase the dealership when, in fact, the actual capitalization required was $900,000. Plaintiff points to the following deposition testimony. James testified:

> Q. Do you recall ever discussing working capital requirements that Chrysler Financial had?
>
> A. I recall me asking the specific question about how much money do I need to bring to the table and was told $800,000 total.

(James depo. 52) Further,

> Q. What did you tell Mr. Perry about the financing application and why you needed him as a cosigner?
>
> A. I don't believe that I gave him any reasons. I told him that I have a deal that I'm working on, total capitalization that's required of me is $800,000 ...

(*Id.* 71) Laval Perry testified:

> Q. Who did you communicate with from Chrysler Financial who told you about this requirement of $800,000 capitalization?
>
> A. That would be -- I'm not sure if it was Parks [sic] or -- maybe it was Parks.
>
> Q. When did you speak with Mr. Park about this?
>
> A. I don't know exact dates.

12

> Was it before you signed the guarantee?
>
> A. We talked about the monies prior to the guarantee.

(Perry depo. 54-55)

Plaintiffs further assert that an auto industry practice exists "whereby manufacturers have a prospective dealer sign what essentially amounts to a waiver in circumstances where a dealer is going into a new dealership venture undercapitalized." (Doc. 52 at 2-3) Plaintiffs state that neither the manufacturer nor defendant ever asked them to sign such a document. James testified:

> A. [Perry] was in disbelief that they allowed the store to be opened short of their guidelines of cash, cash requirement. And he asked me if they ever discussed -- he asked me did I recall any discussions or did I sign anything at the onset saying that they were allowing the store to be opened with a cash shortage. And I told him absolutely not -- I'm sorry.  He did ask me specifically [whether or if] I signed a document indicating that I was going to - that I agreed to opening the store being short of cash.  I told him no such document existed because I was not aware of the fact that they quote, unquote, allowed us to open the store short of cash.

(James depo. 182-183) Laval Perry testified

> ... I can say that based on the numbers that we have today, that clearly I was not told exactly -- when they told me it was 800,000, they didn't tell me that we were short going into this deal and that, you know, by X amount of dollars, and that if it was an amount of money that was short that we would have to  maybe bring it up to their working capital guide by a certain amount of time -- and I say that because I have bought dealerships before and the working capital guidelines are very stringent. And if they reduced the working capital guideline, more than likely they have you sign off on a document stipulating that you are not at the right guideline, therefore if the dealership fails, we are not responsible. It's almost like a waiver.

(Perry depo. 114)

Plaintiff asserts that defendant informed James and Perry after the purchase of the dealership that the actual capitalization required for the operation of the dealership was $900,000 and that defendant agreed to finance plaintiffs knowing that the initial $800,000

13

investment was $100,000 short of the required capitalization going into the deal. James testified, "And McNellis tells me, tells us June 3 or June 4, 'we let you in the store as a favor to you even though you were $100,000 short.' "  (James depo. 146) Laval Perry testified:

> Q. Who initiated the meeting? Who said let's have a meeting?
>
> A. I think Chrysler Credit.
>
> Q. Chrysler Financial?
>
> A. I'm sorry. Chrysler Financial.
>
> ***
>
> Q. Who said that you needed to put $180,000 in working capital into the dealership?
>
> A. I think that was McNelis.
>
> Q. Did he explain why?
>
> A. Yes, he said that would bring it up to -- back to guide.
>
> Q. What did you mean by "back to guide," do you know?
>
> A. In other words, it would bring it up to the working capital requirements.
>
> ***
>
> Q. What was your reaction to Mr. McNelis saying that you, and when I say  you -- strike that. When you say Mr. McNelis said you needed to put in an extra $180,000 of working capital into the dealership, Mr. McNelis, as you understand, was referring to you and Mr. James combined, correct?
>
> A. Yes.
>
> ***
>
> Q. What was your reaction to Mr. McNelis saying this?
>
> A. My reaction was basically how did he come up with that number, and -- since we had only lost about $60,000 for the year. And his response was well, that would now bring you back up to the required guide.

> Q. And did you say anything to Mr. McNelis in response to this?
>
> A. Yes.
>
> Q. What did you say?
>
> A. My question to him was how could -- only losing 60,000, did we have to put in another 180 to bring it up to working capital guide when we had only lost $60,000 for the year? And his response was, well -- I said, that means we were short going into the deal initially. And he said yeah, but we adjusted it and that brings you back up to the working capital required guide.
>
> Q. What was your reaction?
>
> A. I was a little shocked.
>
> Q. Did you say anything to him?
>
> A. Yes, I said I don't believe you guys let us come into the deal undercapitalized.

(Perry depo.78-81)

On the basis of this testimony, plaintiff contends that defendant allowed the financing of the dealership to be processed despite the fact that defendant knew the transaction would be completed with $100,000 less capitalization than was required.

Finally, plaintiffs point to Perry's deposition testimony that "Had I known, as I found out in June, that we required 900,000, I would never have done the deal..."  (Perry depo. 91) And James testified:

> ...if Mr. McNelis told Laval and told me that we needed an additional $100,000 to do this deal, this deal would not have happened.  I have been consistent in saying to you that I only had a certain amount of money to put into the deal, very consistent with that. Laval Perry, I know as a business person would have not brought another $100,000 to the table to do this deal....

(James depo. 188)

Based on James's and Laval's testimony, plaintiffs assert that issues of fact remain

15

precluding summary judgment on the fraud claim as there is evidence of a material representation relied upon by James and Laval regarding the capitalization required for the transaction, and that James relied upon it to his detriment as he and the investors would not have entered into the transaction had defendant represented the true capitalization figure of $900,000 prior to the contract being signed.  Plaintiffs assert that defendant's intent to have James rely on the representation is inferred given that defendant would not have represented a capitalization requirement of $100,000 less than what was actually expected had it not been intended to mislead plaintiffs into investing in the dealership.  On this basis, plaintiffs assert issues of fact remain on the fraud claim and on the Counterclaim.

The Court agrees with defendant that summary judgment is warranted on plaintiffs' fraud claim.

The Complaint alleges that defendant "never mentioned to James that the deal as finalized was undercapitalized" and that defendant "concealed the truth about the undercapitalization with the intent of inducing plaintiffs to pursue financing" with defendant. In their brief, plaintiffs' argument[2] regarding fraud is based upon two assertions:

---

[2] James testified at deposition:

> Q. Can you tell me precisely what you think Chrysler Financial did that it should not have done or didn't do that it should have done that led to the fraud allegation?
>
> A. Chrysler was not being forthcoming with me regarding the necessary cash that I needed in the store to be successful.
>
> Q. Chrysler Motors or Financial?
>
> A. I'm sorry. Chrysler Financial was not being forthcoming with me regarding the cash needed to be successful in the store.

16

>1) Defendant told James and Perry that $800,000 was "needed to purchase the dealership," that was the "amount of capitalization required in order to complete purchase of the dealership." Subsequent to the purchase of the dealership, defendant informed James and Perry that the "actual capitalization required for operation of the dealership was $900,000 and further that it agreed to finance Rod James knowing that the initial $800,000 investment was $100,000 short of the required capitalization going into the deal."
>
>2) Plaintiffs were never asked to sign a waiver given that the venture was undercapitalized.

To the extent that plaintiffs are asserting that defendant failed to disclose the amount of capital required for Rod James CJD to succeed, plaintiffs do not dispute that defendant had no legally cognizable duty to disclose the information because the parties to the business transaction dealt at arm's length and there was no duty to disclose material information to the other. *Blon*, *supra*. Plaintiffs do not dispute that they were merely debtor and guarantor and defendant a creditor and, therefore, no fiduciary duty arose. *Id., see also* O.R.C. § 1109.15(E) ("Unless otherwise expressly agreed in writing, the relationship between a bank and its obligor, with respect to any extension of credit, is that of a creditor and debtor, and creates no fiduciary or other relationship between the parties.")

With regard to plaintiffs' assertion that it is auto industry practice that manufacturers have undercapitalized prospective dealers sign a waiver, plaintiffs do not dispute that

---

>Q. And that's the $800,000 figure that you mentioned earlier?
>
>A. That's correct.
>
>Q. Is there anything else that you claim that they did or did not do that leads to the fraud allegation?
>
>A. Not that I recall at this time.
>
>(James depo. 88-89)

17

Chrysler Financial *financed* the deal and is not an automobile *manufacturer*. Chrysler Financial is not owned by, or an agent of, Chrysler Motors, LLC. (McNelis aff.) Chrysler Financial does not manufacture automobiles but is a financing company. (*Id.*) Plaintiffs do not contest this evidence.

To the extent that plaintiffs are asserting that defendant made a material misrepresentation of fact, plaintiffs do not dispute that defendant's belief that Rod James CJD was undercapitalized is a matter of opinion, and not fact, as the amount of capital required for business success is subject to change based on the company's business plan and changing market conditions. It is a matter open to debate by reasonable minds and not a statement of fact.

Plaintiffs assert that they relied on the misrepresentation as evidenced by James's and Perry's testimony that they would not have entered into the transaction had defendant represented that they needed another $100,000 to do the deal and the true capitalization figure of $900,000 prior to a contract being signed. However, plaintiffs do not address or contest the evidence showing that James stated in two letters that the "working capital that Chrysler Financial would like [him] to start with" or its "working capital guide" was $500,000.[3] (Doc.

---

[3]  James explained the seeming discrepancy between the $500,000 and $800,000 figures at deposition,
Q. Do you recall ever discussing working capital requirements that Chrysler Financial had?

A. I recall me asking the specific question about how much money do I need to bring to the table and was told $800,000 total.

Q. Did the $800,000 include the amount of money that it would cost you to purchase the previous store?

49 Exs. 14 and 16)  As defendant asserts and plaintiffs do not contest, Chrysler Financial raised the possibility that Rod James CDJ might require higher levels of working capital than plaintiffs had initially planned and, thus, plaintiffs could not have reasonably relied on any representation that the minimum level of working capital required as a condition of extending financing would then be sufficient to ensure plaintiffs' success. Moreover, as discussed above, the evidence shows that defendant originally rejected plaintiff's loan application because, among other things, plaintiffs lacked sufficient working capital. After James urged Chrysler Financial to reconsider, defendant did and accepted a lower working capital requirement.  On this basis, there can be no reasonable reliance.

Finally, defendant points out that the fraud claim itself is nebulous.  First, the claim alleges that *defendants* concealed the truth and fraudulently induced plaintiffs, although it is also alleged that plaintiff's justifiably relied on Chrysler Financial's misrepresentations and concealments.  Second, plaintiffs do not explain what they mean by "undercapitalization" or differentiate between the level of capital required by Chrysler Motors as a condition to awarding a franchise, the level of capital required by Chrysler Financial as a condition of financing the purchase of a franchise, and the level of capital required in order to successfully operate a franchise in an unprecedented down market for automotive sales.

As Chrysler Financial provided financing, the capitalization requirements it named

---

A. Yes.

Q. How much did you purchase the store for?

A. $300,000.

(James depo. 52)

related only to its requirements for providing financing. Since Chrysler Financial extended financing on the terms and conditions referenced in the Loan Documents, plaintiffs must have met whatever financing requirements Chrysler Financial had at the time that financing was approved. Plaintiffs must have additionally satisfied whatever capital requirements Chrysler Motors imposed since the latter approved transfer of the dealership. To the extent that plaintiffs are arguing that defendant should have revealed the amount of capital plaintiffs needed to successfully run the business, that is a matter of opinion.

For these reasons, summary judgment is warranted on the fraud claim. Because plaintiffs do not offer any other reasons to dispute that summary judgment is also warranted on the Counterclaim and Third-Party Complaint, judgment is rendered in defendant's favor on those claims as well for the reasons stated by defendant.

**Conclusion**

For the foregoing reasons, defendant and third-party plaintiff Chrysler Financial Services Americas LLC's Motion for Summary Judgment is granted as to all counts of the Complaint and Counts One and Two of the Counterclaim and Third-Party Complaint. Defendant must submit to this Court within 10 days of this Order a proposed judgment entry which includes the amounts due by plaintiffs and third-party defendant to date. To the extent defendant is seeking attorneys' fees, a separate motion must be filed.

IT IS SO ORDERED.

    /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 6/9/10